## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**CORNELE A. OVERSTREET,**
**Regional Director, Region 28 of the**
**National Labor Relations Board,**
**For and On Behalf of the**
**NATIONAL LABOR RELATIONS BOARD,**

      **Petitioner,**

**vs.**　　　　　　　　　　　　　　　　　　　**No. CIV 12-240-JAP-KBM**

**ALBERTSON'S, LLC,**

      **Respondent.**


### FINDINGS OF FACT, CONCLUSIONS OF LAW,
### AND MEMORANDUM OPINION

Petitioner Cornele Overstreet, Regional Director of Region 28 of the National Labor

Relations Board (Board), filed a Petition[1] on behalf of the Board, seeking a temporary injunction

directed at alleged unfair labor practices committed by Albertson's, LLC at Store 917, a grocery

store in Albuquerque, New Mexico. The Board seeks temporary relief under Section 10(j) of the

National Labor Relations Act (Act), 29 U.S.C. § 160(j), which empowers the Board to petition

the district court for temporary relief during the pendency of unfair labor practice proceedings

---

[1] On March 8, 2012, Petitioner filed a PETITION OF THE NATIONAL LABOR
RELATIONS BOARD FOR TEMPORARY INJUNCTION UNDER SECTION 10(j) OF THE
NATIONAL LABOR RELATIONS ACT (Doc. No. 1) (Petition) and a MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR INJUNCTION UNDER
SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT (Doc. No. 1-4). On March
30, 2012, Albertson's filed RESPONDENT ALBERTSON'S LLC'S RESPONSE IN
OPPOSITION TO PETITION OF THE NATIONAL LABOR RELATIONS BOARD FOR
TEMPORARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR
RELATIONS ACT (Doc. No. 31).

before the Board.

The Board asks the Court for an order enjoining certain enumerated conduct by Albertson's and requiring Albertson's to take multiple affirmative actions.[2] The Court has considered the entire administrative record, including the decision of Administrative Law Judge William Schmidt, as well as the parties' pleadings, briefs, proposed findings of fact and conclusions of law, and arguments. The Court has viewed the evidence and made findings of fact in the light most favorable to the Board. The Court concludes that the Board has shown reasonable cause to believe that Albertson's has committed unfair labor practices, as required under Section 10(j) of the Act. Accordingly, the Court will grant the Board's Petition and will enter an Order granting such temporary injunctive relief as the Court deems just and proper.

## BACKGROUND

### A.    Procedural History

On March 3, 2011, cashier Yvonne Martinez filed an unfair labor practice charge against Albertson's with the Board in Case 28-CA-023387, alleging that Albertson's violated Section 8(a)(3) of the Act by firing her because she engaged in union activity on behalf of the United Food and Commercial Workers Union, Local 1564 (Union). Doc. No. 1-17, at 2. On April 29, 2011, Yvonne Martinez amended her unfair labor practice charge, alleging that Albertson's has violated, and is violating, Section 8(a)(1) of the Act by promulgating no solicitation rules and no talking rules at work, which prohibit employees from engaging in union activity, and by

---

[2] On March 8, 2012, the Board filed its proposed ORDER GRANTING TEMPORARY INJUNCTION PURSUANT TO 29 U.S.C. 160(j) (Doc. No. 1-5). On May 29, 2012, the Board filed an amended proposed ORDER GRANTING TEMPORARY INJUNCTION PURSUANT TO 29 U.S.C. 10(j) (Doc. No. 42-2).

soliciting grievances from employees for the purpose of dissuading them from supporting the Union. Doc. No. 1-19, at 4-5.

The Board investigated Yvonne Martinez's allegations to determine whether Albertson's committed unfair labor practices in violation of Sections 8(a)(1) and 8(a)(3) of the Act. Doc. No. 41, ¶ 6. After completing the investigation, on April 29, 2011, the Board issued a complaint against Albertson's in Case 28-CA-23387. Doc. No. 1-19, at 7-13. On May 13, 2011, Albertson's filed an answer to the complaint in Case 28-CA-23387, denying that Albertson's committed any unfair labor practices. Doc. No. 1-19, at 17-19.

On June 6, 2011, the Union filed an unfair labor practice charge against Albertson's with the Board in Case 28-CA-023538, alleging that Albertson's violated, and is violating, Sections 8(a)(1) and 8(a)(3) of the Act by unlawfully discriminating against cashier Talie Perea with regard to her schedule. Doc. No. 1-19, at 24-25. Additionally, the Union alleged that Albertson's violated Section 8(a)(1) of the Act by threatening employees with unspecified reprisals for participating in union activity and by promulgating a no talking rule among employees who worked in the front end of the store. *Id.* On August 12, 2011, the Union amended its charge, alleging that Albertson's has violated, and is violating, Section 8(a)(1) of the Act by giving employees wage increases and other benefits during the Union organizing campaign and by soliciting grievances from employees for the purpose of dissuading employees from supporting the Union. Doc. No. 1-19, at 29-31. The Board investigated the Union's charges, and on August 16, 2011, the Board issued a consolidated complaint against Albertson's, combining the allegations in Case 28-CA-023538 with those in Case 28-CA-023387. Doc. No. 1-19, at 33-41. On August 30, 2011, Respondent filed its answer to the consolidated complaint, denying that Albertson's committed any unfair labor practices. Doc. No. 1-19, at 44-49.

3

Administrative Law Judge William L. Schmidt (ALJ Schmidt) held an administrative hearing in Albuquerque, New Mexico over the course of eight days: September 27 through 30, 2011; November 7 and 8, 2011; and December 5 and 6, 2011. Doc. No. 1, at 4. Twice during the course of the hearing the Board sought leave to amend the consolidated complaint to allege additional unfair labor practices. First, on November 4, 2011, the Board sought to add an allegation that Albertson's violated Section 8(a)(1) of the Act by conducting unlawful surveillance of employees' union activity. Doc. No. 1, at 4; Doc. No. 1-17, at 57. Then, on November 28, 2011, the Board sought to add an allegation that Albertson's violated Section 8(a)(1) of the Act by failing to provide employees with proper safeguards before questioning employees in preparation for the unfair labor practice hearing. Doc. No. 1, at 4; Doc. No. 1-17, at 60. The ALJ granted the Board leave to amend the consolidated complaint to include these new allegations. Doc. No. 1, at 4.

On March 8, 2012, the Board filed its Petition for temporary injunctive relief, along with a supporting brief, proposed order, and proposed findings of fact and conclusions of law. *See* Doc. Nos. 1, 1-4, 1-5, 1-12. The Court held a hearing on March 15, 2012, at which attorneys Sophia Alonso and David Garza represented the Board, and attorneys Thomas Stahl and Jeffrey Lowry represented Albertson's. *See* Doc. No. 22. The Court held a second hearing on April 12, 2012, at which attorneys Sophia Alonso and David Garza represented the Board, and attorneys Thomas Stahl and Glen Beard represented Albertson's. *See* Doc. No. 37. At the April 12, 2012, hearing, the Court requested that the parties file proposed findings of fact and conclusions of law in a specific format outlined by the Court. On April 23, 2012, both parties filed proposed

4

findings of fact and conclusions of law, using the Court's requested format.[3]

On May 24, 2012, ALJ Schmidt issued his Decision and Recommended Order in Case 28-CA-023387 and Case 28-CA-023538. *See* JD-25-12, 2012 WL 1893639 (May 24, 2012) (Doc. No. 42-1). ALJ Schmidt's decision constitutes a recommendation for the Board's ultimate disposition of the case. *See generally* 29 C.F.R. §§ 102.45, 102.46. In his decision, ALJ Schmidt concluded that Albertson's committed some of the unfair labor practices alleged by the Board but recommended the dismissal of some of the other allegations.

On May 29, 2012, the Board modified its Petition. Doc. No. 42, at 5-6. The Board withdrew its request for temporary injunctive relief addressing the following charges: (1) that Albertson's promulgated unlawful no solicitation and no talking rules in violation of Section 8(a)(1) of the Act, (2) that Albertson's discriminated against cashier Talie Perea with regard to her schedule in violation of Section 8(a)(3) of the Act, (3) that Albertson's unlawfully gave employees a wage increase and employee barbeque during the union organizing campaign for the purpose of dissuading support for the Union in violation of Section 8(a)(1) of the Act, and (4) that Albertson's failed to provide employees with proper safeguards before questioning employees in preparation for the unfair labor practice hearing in violation of Section 8(a)(1) of the Act. *See* Doc. No. 42, at 5. ALJ Schmidt concluded that Albertson's committed the following unfair labor practices: (1) suspending and terminating Yvonne Martinez's employment in violation of Section 8(a)(3) of the Act, (2) conducting unlawful surveillance of employees' union activity in violation of Section 8(a)(1) of the Act, (3) soliciting employee grievances during the

---

[3] On April 23, 2012, the Board filed PETITIONER'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW (Doc. No. 41), and Albertson's filed RESPONDENT ALBERTSON'S LLC'S REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW (Doc. No. 40).

union organizing campaign in violation of Section 8(a)(1) of the Act, and (4) threatening

employees with discharge and other, unspecified reprisals if they engage in union activity. *See*

Doc. No. 42-1. The Board asserts that temporary injunctive relief is still necessary to address

these unfair labor practice violations. Doc. No. 42, at 5.

**B.**     **The National Labor Relations Act**

The Board seeks a temporary injunction under Section 10(j) of the National Labor

Relations Act (Act), 28 U.S.C. § 160(j). Under Section 10(j),

> The Board shall have power, upon issuance of a complaint . . . charging that any
> person has engaged in or is engaging in an unfair labor practice, to petition any
> United States district court . . . for appropriate temporary relief or restraining order.
> Upon the filing of any such petition the court shall cause notice thereof to be served
> upon such person, and thereupon shall have jurisdiction to grant to the Board such
> temporary relief or restraining order as it deems just and proper.

28 U.S.C. § 160(j). The Court retains jurisdiction over an action filed under Section 10(j) "until

the Board issues its final order in the underlying action." *Sharp v. Webco Indus., Inc.*, 225 F.3d

1130, 1136 (10th Cir. 2000).

In this case, the Board issued a complaint alleging that Albertson's engaged in multiple

unfair labor practices in violation of Sections 8(a)(1) and (3) of the Act. Section 8(a)(1) of the

Act prohibits employers from interfering with, restraining, or coercing employees in the exercise

of the rights guaranteed by Section 7 of the Act, including "the right to self-organization, to

form, join, or assist labor organizations, [and] to bargain collectively through representatives of

their own choosing." 29 U.S.C. § 157; *see* 29 U.S.C. § 158(a)(1). Section 8(a)(3) of the Act

prohibits employers from discriminating against employees "in regard to hire or tenure of

employment or any term or condition of employment to encourage or discourage membership in

any labor organization." 29 U.S.C. § 158(a)(3).

**C.**   **Standard of Review**

The Tenth Circuit reviews the Court's decision to grant or deny a Section 10(j) petition

for "faulty legal premises, clearly erroneous factual findings, or improper application of the

criteria governing preliminary injunctive relief." *Sharp*, 225 F.3d at 1134 (quotation omitted).

**D.**   **Injunctive Relief under Section 10(j) of the Act**

In the Tenth Circuit, a district court should grant injunctive relief under Section 10(j) if

(1) "the Board establishes reasonable cause to believe that the Act has been violated," and (2) the

Court concludes that the relief sought by the Board is "just and proper." *Id.* at 1133 (quotation

marks and citation omitted).

"[T]o establish reasonable cause, the Board does not have to prove that an unfair labor

practice has occurred" but must present evidence "sufficient to permit a rational factfinder,

considering the evidence in the light most favorable to the Board, to rule in favor of the Board."

*Id.* at 1134 (quotation marks and citation omitted). The Board must show "that its position is

fairly supported by the evidence" and "convince the district court that its theory of liability is

valid, substantial, and not frivolous." *Id.* (quotation marks and citation omitted). In considering

reasonable cause, the Court does not make a determination of whether unlawful activity actually

occurred. *Id.* at 1134-35. Moreover, in reviewing a petition for temporary injunctive relief under

Section 10(j) of the Act, the Court does not evaluate the credibility of witnesses or resolve

disputed facts.  *N.L.R.B. v. Gold Spot Dairy, Inc.*, 417 F.2d 761, 762 (10th Cir. 1969) ("[I]t is the

peculiar province of the Board" to evaluate the credibility of witnesses and "to draw permissible

inferences from credible testimony.").

"If the court finds that there is reasonable cause to believe that unfair labor practices have

been committed, the court must next determine whether injunctive relief is just and proper."

*Sharp*, 225 F.3d at 1135 (quotation marks and citation omitted). Temporary injunctive relief is

"just and proper" when "the circumstances of the case . . .  demonstrate that there exists a

probability that the purposes of the Act will be frustrated unless temporary relief is granted." *Id.*

(quotation marks, citation, and brackets omitted). If a union's organizational campaign has been

hindered by unfair labor practices, restoring and revitalizing the union's campaign furthers the

purposes of the Act. *See id.* at 1136. Congress intended for Section 10(j) "to give the Board a

means of preserving the status quo pending the completion of administrative procedures." *Id.* at

1135; *see also Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967) ("Preservation and restoration

of the status quo are . . . appropriate considerations in granting temporary relief pending

determination of the issues by the Board."). "Any order of the Board will be an empty formality

if, when finally issued, respondent . . . has succeeded in destroying any employee interest or

initiative in union representation and collective bargaining." *Angle*, 382 F.2d at 660.

Temporary injunctive relief under Section 10(j) of the Act is not a substitute for the

Board's exercise of its remedial power, and the Court should grant only the relief that is

"reasonably necessary to preserve the ultimate remedial power of the Board." *Sharp*, 225 F.3d at

1135. The Tenth Circuit has noted that Section 10(j) relief becomes less effective in remedying

unfair labor practices as time elapses. *Angle*, 382 F.2d at 661. Delay by the Board in filing a

Section 10(j) petition becomes significant to the just and proper inquiry "if the harm has

occurred and the parties cannot be returned to the status quo or if the Board's final order is likely

to be as effective as an order for interim relief." *Sharp*, 225 F.3d at 1136 (quotation marks and

citation omitted).

Although inordinate delay may nullify the effectiveness of a Section 10(j) injunction in

some cases, the Court should afford the Board leniency to delay filing a 10(j) petition because

deference to the Board is built into the statutory scheme of the Act. *See id.* In *Sharp*, the

following factors were relevant to the Tenth Circuit's conclusion that the Board's seven month

delay in seeking a Section 10(j) injunction should not preclude the issuance of an injunction: (1)

"the Board's historical progress has been lumbering at best, and the resultant backlog

necessitates some delay," (2) "the Board needs a reasonable period of time to investigate,

deliberate, and authorize the filing of a § 10(j) action," and (3) the Board filed an amended

complaint just four and a half months before the filing the Section 10(j) petition. *Id.* Other courts

have ordered injunctive relief despite lengthy delays. *See, e.g.*, *Overstreet v. El Paso Disposal,*

*L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (concluding that delay alone was not dispositive);

*Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 544-45 (4th Cir. 2009) (affirming

injunction despite eighteen month delay between filing of complaint and filing of petition);

*Paulsen v. Renaissance Equity Holdings, LLC*, ___ F. Supp. 2d ___, 2012 WL 1033339, at *25

(E.D.N.Y. Mar. 27, 2012) (noting that the "fourteen-month delay in this case appears to be

typical in § 10(j) proceedings, and courts have granted § 10(j) injunctions despite even longer

delays").

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.     Suspension and Discharge of Yvonne Martinez

The Board argues that Albertson's violated Section 8(a)(3) of the Act by suspending and

firing union organizer Yvonne Martinez in order to stop the Union's organizing campaign at

Store 917. *See* Doc. No. 1-4, at 8, 31, 44. The Board argues that Albertson's actions sent "the

inescapable message to the employees that union activity will cost them their jobs." *Id.* at 43. In

the Board's view, a final Board reinstatement order will be issued "too late to erase the chilling

effect" of Albertson's misconduct. *Id.* at 45. Accordingly, the Board asks the Court to reinstate

Martinez's employment on a temporary basis in order to revitalize the Union's organizing campaign and to restore the status quo at Store 917. *Id.* at 46-47.

      Albertson's argues that Yvonne Martinez was fired because she violated Albertson's policy regarding promotional coupons. *See* Doc. No. 31, at 20-29. Additionally, in Albertson's view, interim reinstatement of Martinez is not just and proper because the Board delayed seeking injunctive relief for one year. *See id.* at 8-14. Due to this delay, Albertson's contends that "any alleged damage to the Union organizing campaign has long since occurred and interim relief would be no more effective than a final Board order." *Id.* at 4.

      An employer violates the Act by firing "an employee for having engaged in protected activities when there is no legitimate reason for the discharge, or the reasons offered are only pretexts." *Ready Mixed Concrete Co. v. N.L.R.B.*, 81 F.3d 1546, 1550 (10th Cir. 1996). In order to prove that a discharge or termination violated Section 8(a)(3), the Board must establish directly or circumstantially that the employer had knowledge of the employee's protected activities. *Id.* at 1551. Additionally, the Board must prove that the employee's protected conduct was a substantial or motivating factor in the adverse employment action. *Id.* at 1550; *see Wright Line, a Div. of Wright Line Inc.*, 251 NLRB 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir. 1981). "[A]n employer's antiunion motivation often may be proven only by circumstantial evidence." *N.L.R.B. v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir. 2003) (quotation marks and citation omitted). "Thus, in determining a company's motivation, the [Board] may consider factors such as the employer's knowledge of the employee's union activities, the employer's commission of other unfair labor practices, the timing of the employer's action, and the credibility of its explanation of the reasons for the discharge." *Id.* (quotation marks, citation, and brackets omitted).

10

On May 24, 2012, ALJ Schmidt concluded that Albertson's knew Yvonne Martinez was a key player in the union organizing effort and discharged Yvonne Martinez because of her union activities and sympathies. Doc. No. 42-1, at 44-45.

### *Findings of Fact*

1.  Yvonne Martinez worked for Albertson's as a front end cashier for twenty-five years in Albuquerque, New Mexico. *See* Doc. No. 1-18, at 555.

2.  Until she was fired, Yvonne Martinez usually worked the morning shift at Store 917. *See* Doc. No. 1-18, at 556.

3.  Yvonne Martinez's direct supervisor was Service Operations Manager Lucinda ("Cindy") Andablo. Yvonne Martinez reported to Assistant Front End Manager Alice Andrick when Cindy Andablo was not at work. Doc. No. 1-18, at 556.

4.  In August or September 2010, Yvonne Martinez was approached by Union representative Juan Vasquez in the parking lot at Store 917. Juan Vasquez asked Yvonne Martinez if she would be interested in union activity, and Yvonne Martinez answered yes. Doc. No. 1-18, at 561-62; Doc. No. 1-24, at 24-25.

5.  Prior to speaking with Juan Vasquez, Yvonne Martinez spoke with cashier Talie Perea about the Union. Talie Perea's husband is a Union member who works in the meat department at Store 917, which is a unionized department. Doc. No. 1-18, at 500, 562; Doc. No. 1-24, at 23.

6.  The day after Yvonne Martinez spoke with Juan Vasquez in the parking lot, Yvonne Martinez and Talie Perea organized an evening meeting at a local Pizza Hut restaurant where several interested employees from Store 917 gathered and spoke with Juan Vasquez about the Union. Doc. No. 1-18, at 562-64; Doc. No. 1-24, at 24-25.

7.      At the meeting, Yvonne Martinez signed a union authorization card and obtained a stack
        of union cards from Juan Vasquez to distribute to other Albertson's employees at Store
        917. Doc. No. 1-18, at 564.

8.      After the meeting, Yvonne Martinez and Talie Perea began asking other employees if
        they were interested in the Union and began distributing union cards at work. This
        activity took place in the front end of the store, in the store parking lot, and in the
        employee break room. Doc. No. 1-18, at 565-66, 568; Doc. No. 1-24, at 24-26.

9.      Yvonne Martinez spoke to other employees about the benefits on unionization, including
        medical coverage, employee scheduling according to seniority, and the ability to vote on
        a contract. Doc. No. 1-18, at 580.

10.     In 2010, Albertson's ran a winter holiday promotion that involved giving customers
        "Catalina coupons," which customers could redeem for $10 towards the purchase of a
        gift card. Doc. No. 1-18, at 84-85.

11.     If a customer purchased at least $100 worth of groceries in a single order during the
        promotion, a Catalina coupon would print automatically from a printer located next to the
        receipt printer at the cash register station. Doc. No. 1-18, at 84-85.

12.     Under Albertson's Catalina coupon policy for employees, cashiers must immediately
        destroy and discard Catalina coupons that are not accepted by the customer. Cashiers
        cannot keep Catalina coupons for personal use. A cashier who violates the policy "will be
        subject to termination without further warning." Doc. No. 1-23, at 2.

13.     At the administrative hearing, Yvonne Martinez testified that she had been working the
        morning shift on December 1, 2010, when she noticed she had forgotten to give a
        customer a Catalina coupon. Doc. No. 1-18, at 585.

12

14.    After the customer had left, Yvonne Martinez tore the coupon off the printer and put it on
       the counter at her cash register station. Doc. No. 1-18, at 585-86.

15.    Around the time Yvonne Martinez tore the coupon off the printer and set it on the
       counter, a customer gave Yvonne Martinez a donut. Doc. No. 1-18, at 586.

16.    Yvonne Martinez placed the donut on an unopened plastic grocery bag on the counter at
       her cash register station and began taking bites of the donut between customers. Doc. No.
       1-18, at 586-87.

17.    Before Yvonne Martinez finished the donut, she placed the donut and the unopened
       plastic grocery bag inside the supply drawer at her cash register station. Doc. No. 1-18, at
       587.

18.    Manager Alice Andrick testified at the administrative hearing that, at about 10:00 a.m. on
       December 1, 2010, she found a $10 Catalina coupon in the supply drawer of the cash
       register station where Yvonne Martinez was working, tucked underneath an unopened
       plastic grocery bag. Doc. No. 1-18, at 244-47.

19.    Alice Andrick took the Catalina coupon out of the supply drawer and put it in a safe in
       the managers' office. Alice Andrick had never found an unused coupon at a register
       station before, and when Andrick had previously found Catalina coupons on the floor,
       she had thrown them in the trash rather than putting them in the safe. Doc. No. 1-18, at
       248-52.

20.    After Alice Andrick put the Catalina coupon in the safe, Yvonne Martinez was called
       into the office to talk to Store Director Don Merritt, District Loss Prevention Manager
       Mark Zbylut, and Alice Andrick. Doc. No. 1-18, at 590-91.

21.   In an interview and a written statement, Yvonne Martinez denied knowing there was a Catalina coupon in the supply drawer at her cash register station. Doc. No. 1-18, at 591.

22.   On December 1, 2010, Don Merritt suspended Yvonne Martinez's employment pending an investigation into the Catalina coupon found in the supply drawer. Doc. No. 1-18, at 591-92.

23.   As part of the investigation, Mark Zbylut viewed a video recording from a surveillance camera that was located in the front end of Store 917. *See* Doc. No. 1-23, at 44.

24.   In a written report, Mark Zbylut stated that the video shows Yvonne Martinez removing the $10 coupon from the coupon printer, turning around, and placing the coupon on the counter or in the drawer behind her. Doc. No. 1-23, at 44.

25.   At the administrative hearing Mark Zbylut testified that, although the video shows Yvonne Martinez placing the coupon on the counter, it does not show Yvonne Martinez placing the coupon in the supply drawer. Mark Zbylut also admitted that he could not actually see Yvonne Martinez's hands in the portion of the video where Yvonne Martinez allegedly removed the coupon from the printer and placed the coupon on the counter. Doc. No. 1-26, at 64, 68.

26.   No eyewitness saw Yvonne Martinez remove the coupon from the printer or place it in the supply drawer. Doc. No. 41, at 6.

27.   Associate Relations Manager Angelina ("Angel") Seydel reviewed the investigation and recommended disciplinary action for Yvonne Martinez. Doc. No. 1-18, at 39-40, 49.

28.   Generally, in determining whether to fire an employee for violating the Catalina coupon policy, Angel Seydel considers the investigation into the employee's conduct, any video recording, any attempt to redeem a Catalina coupon at another Albertson's store, any

witness accounts, and the employee's statement and personnel file. Doc. No. 1-18, at 58.

29. Before making a recommendation regarding Yvonne Martinez, Angel Seydel considered an investigation summary created by Mark Zbylut, Mark Zbylut's written report describing the surveillance camera video, Alice Andrick's witness statement, Yvonne Martinez's statement, and several Catalina coupon policy acknowledgment forms that Yvonne Martinez had signed. Doc. No. 1-18, at 59.

30. Angel Seydel also considered Albertson's implementation of the Catalina coupon policy in previous investigations. Doc. No. 1-18, at 59.

31. Angel Seydel considered Yvonne Martinez's case to be unusual because Yvonne Martinez had not tried to redeem the coupon, did not physically possess the coupon, and did not admit that she kept the coupon for personal use. Doc. No. 1-18, at 60-62.

32. Because this was an unusual case, Angel Seydel consulted with other senior managers, including Director of Human Resources Mark Blankenship and District Manager Tom Houston. Doc. No. 1-18, at 61-62.

33. According to Mark Blankenship, all employees that Albertson's had fired under the Catalina coupon policy prior to Yvonne Martinez had either used or attempted to use a coupon. Doc. No. 1-24, at 358-59, 376-77, 380-81.

34. In the past, when Albertson's managers at Store 917 had found unredeemed coupons on coupon printers, the floor, or in cash register supply drawers, the managers reminded cashiers to destroy the coupons and did not investigate or discipline any employees.  Doc. No. 1-18, at 346-49; Doc. No. 24, at 84-88, 262-65.

35. On December 3, 2010, Angel Seydel recommended to Store Director Don Merritt that Yvonne Martinez be fired. Doc. No. 1-18, at 50-51; Doc. No. 1-23, at 14.

36.   According to Angel Seydel, Yvonne Martinez violated the Catalina coupon policy by
      failing to give a coupon to a customer, failing to destroy or discard the coupon after she
      realized she had not given it to the customer, and keeping the coupon for personal use.
      Doc. No. 1-18, at 49.

37.   On December 4, 2010, Don Merritt decided to follow Angel Seydel's recommendation
      and terminate Yvonne Martinez's employment for the alleged violation of the Catalina
      coupon policy. Doc. No. 1-18, at 49, 592-93.

38.   When he fired Yvonne Martinez, Don Merritt knew there had been union organizing
      campaign underway at Store 917 since August 2010. Doc. No. 1-18, at 357.

39.   When he fired Yvonne Martinez, Don Merritt knew that Yvonne Martinez had been a
      union supporter. Doc. No. 1-18, at 450-51; Doc. No. 1-26, at 193-94.

40.   On March 8, 2012, the Board filed a sworn affidavit of Yvonne Martinez in which she
      avers that she wants to return to work at Albertson's and would "organize on behalf of
      the Union even stronger than before" if reinstated. Doc. No. 1-29, at 2-3.

***Conclusions of Law***

1.   The Court concludes that the Board has demonstrated reasonable cause to believe that
     Albertson's violated Section 8(a)(3) of the Act by suspending and terminating Yvonne
     Martinez's employment.

2.   Albertson's does not dispute that Yvonne Martinez engaged in union activities, which are
     protected under Section 7 of the Act.

3.   The Board has demonstrated reasonable cause to believe that Store Director Don Merritt,
     who suspended and fired Yvonne Martinez, knew that Yvonne Martinez was a union
     supporter.

16

4.      The Board has presented sufficient circumstantial evidence for a reasonable factfinder to conclude that Yvonne Martinez's protected conduct was a motivating factor in Albertson's decision to fire Yvonne Martinez.

5.      This circumstantial evidence includes the timing of Yvonne Martinez's discharge, the presence of numerous unfair labor practice allegations, Albertson's decision to fire Yvonne Martinez under the Catalina coupon policy despite the fact that Yvonne Martinez neither possessed nor tried to redeem the coupon, and Albertson's reliance on a video recording that does not conclusively show Yvonne Martinez placing the coupon in the cash register supply drawer.

6.      Temporary reinstatement of Yvonne Martinez is just and proper because reinstating illegally discharged employees is the "best visible means of rectifying" the loss of employee interest in the union organizing campaign. *Angle*, 382 F.2d at 661.

7.      ALJ Schmidt's decision bolsters the Court's conclusion that temporary injunctive relief reinstating Yvonne Martinez is just and proper under the circumstances. *See Overstreet v. El Paso Disposal, L.P.*, 668 F. Supp. 2d 988, 1005 n.28 (W.D. Tex. 2009).

8.      Although ALJ Schmidt recommends that the Board order additional relief regarding Yvonne Martinez, including the issuance of back pay and the removal from Albertson's work files of any reference to Yvonne Martinez's suspension and discharge, *see* APPENDIX, Doc. No. 42-1, at 56-57, the Court concludes that this additional relief should not, at this time, be ordered as part of the Court's temporary injunction. *See Sharp*, 225 F.3d at 1135 (explaining that the Court should grant only the relief "reasonably necessary to preserve the ultimate remedial power of the Board").

B.    **Surveillance of Employee's Union Activity**

The Board argues that Albertson's violated and is violating Section 8(a)(1) of the Act by engaging in unlawful surveillance of employees' protected union activity. Doc. No. 1-4, at 33-35. The Board asks the Court to enjoin Albertson's from engaging in surveillance of employees' union activity and from creating an impression of surveillance. Doc. No. 1-5, at 3. Albertson's argues that no actual surveillance of employees' union activity has occurred. Doc. No. 31, at 48-49.

"An employer may observe public union activity, particularly where such activity occurs on company premises, but an employer violates section 8(a)(1) where company officials do something out of the ordinary to keep union activities under watch." *Albertson's, Inc. v. N.L.R.B.*, 161 F.3d 1231, 1138 (10th Cir. 1998) (quotation marks and citation omitted); *see Villa Maria Nursing & Rehab. Ctr., Inc.*, 335 NLRB 1345, 1350 (2001) ("An employer's mere observation of open, public, union activity on or near its property does not constitute unlawful surveillance."). And employer surveillance of union activity violates Section 8(a)(1) if it is "coercive, threatening or restraining in nature." *Gold Spot Dairy*, 417 F.2d at 762; *see, e.g.*, *Partylite Worldwide, Inc.*, 344 NLRB 1342, 1342 (2005) (finding unfair labor practice when "no less than eight high-ranking managers and supervisors stood at entrances to the employee parking lot watching [union representatives] give literature to employees as they entered and exited the parking lot during shift changes"); *Loudon Steel, Inc.*, 340 NLRB 307, 307 (2003) (concluding that employer unlawfully engaged "in surveillance of employees' union activities by approaching their vehicles as the Union attempted to distribute handbills"); *Fred'k Wallace & Son, Inc.*, 331 NLRB 914, 915 (2000) ("[W]hile an employer can watch open union activity, if it . . . openly takes down names or videotapes that activity, it goes too far and unlawfully creates

18

the impression of surveillance[.]").

Additionally, under certain circumstances an employer may violate Section 8(a)(1) by creating a mere impression of surveillance. *See Lundy Packing Co.*, 223 NLRB 139, 147 (1976), *enf'd in relevant part*, 549 F.2d 300 (4th Cir. 1977). "The idea behind finding 'an impression of surveillance' as a violation of Section 8(a)(1) of the Act is that employees should be free to participate in union organizing campaigns without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways." *Flexsteel Indus.*, 311 NLRB 257, 257 (1993).

On May 24, 2012, ALJ Schmidt concluded that Albertson's "store managers altered their work habits in order to aggressively spy on the employee organizing activities and the union agents assisting the employees." Doc. No. 42-1, at 28. ALJ Schmidt found that Albertson's conduct "would tend to inhibit ordinary employee discussions with each other and with the union representatives assisting their organizing effort." Doc. No. 42-1, at 28.

*Findings of Fact*

41.   Albertson's corporate managers instructed Store Director Don Merritt to report union activity at Store 917 to them. Doc. No. 1-18, at 41-43, 48, 82-83.

42.   In August 2010, Don Merritt informed Angel Seydel that Union representatives were at Store 917 speaking to employees. Doc. No. 1-18, at 44.

43.   When employees would volunteer information to Don Merritt about the Union, Merritt would pass that information on to other Albertson's managers. Doc. No. 1-18, at 359-65, 382-89.

44.   Cashiers Yvonne Martinez and Albert Sanchez testified at the administrative hearing that, after the union organizing campaign began at Store 917, Don Merritt changed his

behavior by collecting shopping carts from the parking lot, a job previously performed by courtesy clerks. Doc. No. 1-18, at 567; Doc. No. 1-24, at 254-55.

45.   Talie Perea testified that, once the union organizing campaign started at Store 917, the managers were "on edge" and became "really observant" of what was going on in the store. In particular, Store Director Don Merritt and other managers changed their behavior by watching the parking lot and standing near the cash registers to observe what cashiers were talking about. Doc. No. 1-24, at 32-34.

### *Conclusions of Law*

9.   The Board has shown reasonable cause to believe that Albertson's surveillance of union activity at Store 917 became coercive, threatening, or restraining when Store Director Don Merritt began policing the parking lot and the front end of the store to keep union activities under watch.

10.   The Board has shown reasonable cause to believe that Albertson's violated Section 8(a)(1) of the Act by creating the impression that union activity is under surveillance at Store 917.

11.   Temporary injunctive relief prohibiting unlawful surveillance is just and proper because enabling employees to engage in union activity without Albertson's managers spying on employees' protected activities will help revitalize of the union organizing campaign at Store 917.

12.   ALJ Schmidt's decision bolsters the Court's conclusion that injunctive relief is just and proper under the circumstances.

C.     <u>Solicitation of Grievances</u>

The Board argues that Albertson's unlawfully solicited employee complaints and

grievances in April 2011 when Director of Labor Relations Danny Ma held one-on-one meetings

with employees during the union organizing drive, in violation of Section 8(a)(1) of the Act.

Doc. No. 1-4, at 38. The Board contends that Albertson's tried to dissuade employees from

supporting the Union by asking employees whether they liked their jobs and whether they had

any questions about benefits, which implied that Albertson's would resolve employee

grievances. *Id.* Albertson's replies that there is no evidence Danny Ma explicitly or implicitly

promised to remedy employees' grievances in his one-on-one meetings with them. Doc. No. 31,

at 39.

An employer violates Section 8(a)(1) of the Act by soliciting "grievances from

employees during a union organizing campaign with the express or implied suggestion that the

problems will be resolved if the union is turned away." *Ctr. Const. Co. v. N.L.R.B.*, 482 F.3d

425, 435 (6th Cir. 2007) (quotation marks and citation omitted). "Where an employer institutes a

new practice of soliciting grievances during an organizational campaign, an inference arises that

the employer is implicitly representing to the employees that their complaints will be addressed

without the need for the union." *Id.* (quotation marks and citation omitted); *see also Naomi*

*Knitting Plant*, 328 NLRB 1279, 1281 (1999) ("The Board has long held that the solicitation of

grievances from employees during union campaigns, in the absence of evidence establishing

grievance meetings were held in the past, raises the inference that the employer is making an

implied promise to remedy the grievances.").

On May 24, 2012, ALJ Schmidt found that Danny Ma's conduct violated Section 8(a)(1)

of the Act because it gave rise to the inference that Albertson's "high level management was

making new and unusual efforts to resolve employee complaints so that union representation would not be necessary." Doc. No. 42-1, at 19.

***Findings of Fact***

46.  According to cashier Albert Sanchez, in April 2011 manager Cindy Andablo told Sanchez that a representative from human resources was upstairs and invited Sanchez to meet with the representative if Sanchez had any problems he wanted to raise. Doc. No. 1-24, at 259-60.

47.  Sanchez went upstairs where he had a one-on-one meeting with Danny Ma, who told Sanchez to call human resources if Sanchez had "any problems or anything." Doc. No. 1-24, at 259-60.

48.  Albert Sanchez has worked at Store 917 for sixteen years but had never had a one-on-one meeting with management to discuss employee benefits or human resources issues prior to April 2011. Doc. No. 1-24, at 243, 315-16.

49.  The same day Albert Sanchez had a one-on-one meeting with Danny Ma, manager Cindy Andablo told Talie Perea that a representative from the human resources department was available to talk upstairs if Perea had problems with her schedule or wanted to complain about anything. Doc. No. 1-24, at 40-41.

50.  Talie Perea decided to go upstairs, where she met with Danny Ma and Don Merritt in the employee break room. Doc. No. 1-24, at 41.

51.  Danny Ma asked Talie Perea whether she liked her job at Albertson's, and Perea said "yes." Doc. No. 1-24, at 41.

52.  Danny Ma asked Talie Perea whether she had any questions about employee benefits. Perea responded that she did not have any questions and did not use Albertson's

22

insurance. Doc. No. 1-24, at 41-42.

53.    Danny Ma asked Talie Perea whether she had any concerns about the store, and Perea answered "no." At the administrative hearing, Perea testified that even if she did have concerns she would not have voiced them at the meeting because she was uncomfortable speaking to Danny Ma in front of Don Merritt. Doc. No. 1-24, at 42.

54.    Talie Perea testified that, prior to the April 2011 meeting with Danny Ma and Don Merritt, Perea had never had a one-on-one meeting with a manager or a human resources representative regarding employee benefits. Doc. No. 1-24, at 220-21.

55.    Employees testified at the administrative hearing that they had not seen Danny Ma at Store 917 before April 2011. Doc. No. 1-18, at 740-41; Doc. No. 1-24, at 41-42, 219-20.

***Conclusions of Law***

13.    The Board has shown reasonable cause to believe that Albertson's violated Section 8(a)(1) of the Act when Danny Ma sat in the employee break room of Store 917 in April 2011 and asked employees if they had any problems or concerns and whether they liked their jobs.

14.    Because Albertson's managers had not previously met with employees one-on-one to discuss problems and concerns, the one-on-one meetings raise an inference that Albertson's made an implied promise to remedy any grievances and that unionization is unnecessary.

15.    Temporary injunctive relief prohibiting Albertson's from instituting new grievance procedures during the union organizing campaign is just and proper.

16.    ALJ Schmidt's decision bolsters the Court's conclusion that injunctive relief is warranted under the circumstances.

**D.**     <u>**Threatening Employees with Discharge and Other Reprisals**</u>

In the Petition, the Board alleges that Albertson's, through manager Alice Andrick,

violated Section 8(a)(1) of the Act in May 2011 by threatening its employees with discharge and

other, unspecified reprisals if they engaged in union activity. Doc. No. 1, at 9. "[A]n employer is

free to communicate to his employees any of his general views about unionism or any of his

specific views about a particular union, so long as the communications do not contain a threat of

reprisal or force[.]" *N.L.R.B. v. Gissel Packing Co.*, 395 US 575, 618 (1968) (quotation marks

omitted).

Although the Board did not provide the factual underpinnings for this particular

allegation in either its Memorandum of Points and Authorities or its proposed findings of fact

and conclusions of law, *see* Doc. Nos. 1-4, 1-12, 41, the Board has supplemented the

administrative record with ALJ Schmidt's decision, which addresses this allegation. *See* Doc.

No. 42-1. The Court has reviewed ALJ Schmidt's decision as well as the portion of the

administrative record cited in the decision.

In his decision, ALJ Schmidt concluded that testimony at the administrative hearing

supports the Board's allegation that Alice Andrick threatened cashier Talie Perea with

unspecified reprisals and with discharge if Perea continued engaging in union activity. Doc. No.

42-1, at 29. ALJ Schmidt found that manager Alice Andrick told Talie Perea that Store Director

Don Merritt "had disparaged Perea because of her union organizing efforts, and warned Andrick

against being friendly with Perea. Andrick purportedly followed this report with her own

perception that the store management was trying to make Perea quit." Doc. No. 42-1, at 29. ALJ

Schmidt concluded that Andrick's remarks had conveyed a threat to Perea by implying that

Perea "was putting her job in jeopardy by engaging in Union organizing activities." Doc. No. 42-

24

1, at 29.

*Findings of Fact*

56.    At the administrative hearing, cashier Talie Perea testified about a conversation she had

with manager Alice Andrick at the front end of Store 917. *See* Doc. No. 1-24, at 45-47.

57.    In the conversation between Perea and Andrick, Andrick conveyed to Perea some

remarks that Store Director Don Merritt had made to Andrick, including that Merritt

knew "all about this union stuff" and that Albertson's had an employee "that thinks that

she's going to get her way." Doc. No. 1-24, at 45.

58.    Andrick went on to tell Perea, "you know what they're trying to do up there; they're

trying to make you quit. They're trying to make you walk away from your job." Doc. No.

1-24, at 46.

59.    Andrick also told Perea that Merritt had told Andrick that Andrick could not talk to Perea

and that Perea was not Andrick's friend. Doc. No. 1-24, at 47.

*Conclusions of Law*

17.    Having conducted an independent review of the administrative record, it is proper for the

Court to consider ALJ Schmidt's factual findings and legal conclusions in determining

whether to grant temporary injunctive relief under Section 10(j). *Overstreet v. El Paso*

*Disposal, L.P.*, 668 F. Supp. 2d 988, 1005 n.28 (W.D. Tex. 2009).

18.    By filing the administrative record and decision by ALJ Schmidt, the Board has shown

reasonable cause to belief that Albertson's, through manager Alice Andrick, violated

Section 8(a)(1) of the Act by threatening Talie Perea with discharge and other,

unspecified reprisals if Perea continued her union activity.

19.    Temporary injunctive relief is just and proper under the circumstances.

## CONCLUSION

**IT IS ORDERED THAT** the Board's Petition for temporary injunctive relief, as modified on May 29, 2012, is granted. *See* Doc. No. 42, at 5-6 (withdrawing in part the injunctive relief requested in the Petition). The Board has shown reasonable cause to believe that Albertson's has committed the following unfair labor practices at Store 917: (1) suspending and terminating Yvonne Martinez's employment in violation of Section 8(a)(3) of the Act, (2) engaging in surveillance of union activity and creating the impression of surveillance of union activity in violation of Section 8(a)(1) of the Act, (3) soliciting employee complaints and grievances during the union organizing campaign in violation of Section 8(a)(1) of the Act, and (4) threatening employees with discharge and other, unspecified reprisals if they engage in union activity in violation of Section 8(a)(1) of the Act. The Court finds that temporary injunctive relief addressing these unfair labor practice allegations is just and proper. In fashioning temporary injunctive relief, the Court uses as guidance the Appendix to ALJ Schmidt's decision. *See* Doc. No. 42-1, at 56-57. The Court will enter an Order granting appropriate relief contemporaneously with these Findings of Fact and Conclusions of Law.

_____

UNITED STATES DISTRICT COURT JUDGE